IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Gary Watson,

      Plaintiff,

    v.                         Case No. 2:06-cv-163

Kraft Foods,

      Defendant.


<u>OPINION AND ORDER</u>

This is a discrimination action filed by plaintiff Gary Watson against defendant Kraft Foods, his former employer. Plaintiff alleges that his employment was terminated in violation of the Americans With Disabilities Act of 1990("ADA"), 42 U.S.C. §12101, <u>et</u> <u>seq</u>. Plaintiff also claims that his employment was terminated in retaliation for filing a claim for workers' compensation, a violation of Ohio Rev. Code §4123.90.

This matter is before the court on the defendant's motion for summary judgment. Plaintiff, who is representing himself in this action, also filed a document styled as a motion for summary judgment in response to defendant's motion. The procedure for granting summary judgment is found in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970). Summary judgment will not lie if the dispute about a material fact

is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).

The Sixth Circuit Court of Appeals has recognized that Liberty Lobby, Celotex and Matsushita effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. Street v. J. C. Bradford & Co., 886 F.2d 1472, 1476 (6th Cir. 1989). The court in Street identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. Id. at 1479. In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Id. (quoting Liberty Lobby, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion. Id. It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" Id. (quoting Matsushita, 475 U.S. at 586). Moreover, "[t]he trial court no longer has a duty to search the entire record to establish

that it is bereft of a genuine issue of material fact." <u>Id</u>.  That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.

<u>I. History of the Case</u>

The declarations, deposition testimony and documentary evidence on file reveal that the defendant operates a distribution center in Groveport, Ohio, known as the Columbus Mixing Center, where food products are received and compiled into customer orders. In February of 2004, plaintiff was hired for a full-time position as a forklift operator at the refrigerated facility of the Mixing Center.  Plaintiff's position entailed operating a forklift to load and unload trucks and manually loading cases weighing five to thirty-five pounds onto pallets from ground level to seven feet. Plaintiff typically worked a ten-hour shift four days a week.

During his employment, plaintiff was disciplined on several occasions in accordance with defendant's corrective action policy. Possible disciplinary action included: (1) a corrective interview, used to inform the employee that a problem is beginning to surface; (2) a written warning, used to give the employee notice that continued misconduct might jeopardize his employment, and that a continued violation will result in a "day of decision" and termination; (3) a "day of decision" which involves a day off without pay, during which the employee must decide if he or she can meet the defendant's standards; if the employee answers "yes," the employee must submit a written plan outlining the actions the employee will take to correct the unacceptable behavior; and (4) termination, which takes into account the seriousness of the

offense, previous actions of the employee, attitude and past performance.

Defendant measures the productivity of employees using a computer system known as WTO. This program monitors employee productivity, taking into account factors such as the type of task being performed, the time taken to complete the task, the distance traveled to complete the task, and the weight of the product involved in the task. The program also takes into account personal fatigue and delay, which includes factors such as the total amount of time the employee has worked on a particular day, restroom breaks, and delays caused by congestion in the work area where the task is being performed. Each forklift operator is required to meet minimum productivity requirements.

Plaintiff's performance fell below the minimum productivity requirements on a number of occasions, resulting in the imposition of discipline. Plaintiff was verbally counseled by his supervisor, Michael Dickerson, on March 29, 2004. On May 1, 2004, a corrective interview was conducted with plaintiff by Byron Howard, who held the position of Day Shift Supervisor and later Operations Advisor, when plaintiff's performance fell below the minimum requirements for the period between April 18-24, 2004. On October 16, 2004, a written coaching was issued to plaintiff by Vowe Menta, who held the position of Day Shift Supervisor, when plaintiff's performance fell below the minimum requirements for the period between October 3-9, 2004. On November 23, 2004, plaintiff was issued a written warning by Menta for the period between November 14-20, 2004. On December 28, 2004, plaintiff was issued a "day of decision" by Howard for the period between December 19-25, 2004, and was

required to submit an improvement plan.

Defendant also documented incidents of accidents or unsafe conduct in which plaintiff was involved. On March 26, 2004, plaintiff improperly placed a pallet on top of another pallet, causing the top pallet to tip over, resulting in damage to thirteen cases of product. No discipline was imposed. On October 16, 2004, plaintiff improperly straightened a pallet, causing it to fall and damaging one case of product. No discipline was imposed. On December 16, 2004, plaintiff struck his elbow against a pole. No discipline was imposed, but plaintiff was recertified in proper procedures. Plaintiff was not treated for this injury until February 23, 2005, at which time he filed a workers' compensation claim against defendant.

On January 19, 2005, plaintiff broke a weld at the bottom of a support brace while operating his forklift. No discipline was imposed, but plaintiff was recertified in proper procedures. On January 29, 2005, plaintiff improperly placed a pallet on a rack, resulting in damage to three cases of product. Plaintiff was counseled on procedures for the correct placement of pallets. On March 5, 2005, plaintiff failed to properly secure a pallet, causing two cases of product to fall from the pallet. Plaintiff was given a verbal warning by Howard and counseled to be more careful. On April 2, 2005, plaintiff failed to secure a pallet, causing it to fall against another pallet. Plaintiff was issued a corrective interview by Howard for six safety infractions within the previous six months. Plaintiff was advised that the failure to improve his safety record will result in further disciplinary action, up to and including termination.

5

On May 20, 2005, Howard asked plaintiff to load empty pallets onto a Talon Logistics trailer, which is a trailer with a low ceiling. Forklift operators were trained to use a "cut-down" forklift with a shorter overhead guard protection fixture when loading Talon trailers because the standard forklifts had overhead guards which were too tall to enter the Talon trailers. The cut-down forklifts were clearly marked with a yellow stripe across the overhead guard. Defendant's policy on accidents and injuries requires employees to immediately report such incidents to a coach or advisor even if the injury appears to be insignificant or there is no property damage.

Pursuant to standard policy, plaintiff completed a pre-operation check list at the start of his shift on May 20th, certifying that the forklift he would be using that day was in proper working order and had no damage. Instead of using a cut-down forklift to load the pallets, plaintiff used a regular forklift. While approaching the Talon trailer, the forklift's overhead guard struck the Talon trailer's header, the area at the top of the trailer which houses the trailer's rear roll-up door. The forklift's headlights were located in the area where the forklift struck the trailer. Later that day, a co-worker informed plaintiff that a headlight on his forklift was broken. However, plaintiff waited until the end of his shift to report the broken headlight. When reporting the accident, plaintiff told Howard that the headlight on the forklift that he have been using that day was broken, and that he had no knowledge of who had broken the headlight. He did not inform Howard that he had struck a Talon trailer with his forklift.

6

Howard, Operations Leader Michael Clouse, and Safety Point Star Representative Thomas Wiegand conducted an investigation which revealed that plaintiff had not stated on the pre-operation checklist that a headlight on the forklift was broken. The investigation also revealed that the Talon trailer plaintiff was loading on May 20th had broken glass on the back edge of the tailgate, damage to its header where the forklift's overhead guard struck it, and damage to the side frame of its door opening at the same height as the broken headlight on the forklift. The investigators determined that plaintiff had struck the Talon trailer while using a standard rather than a cut-down forklift.

Howard contacted plaintiff at home and asked him why he had failed to note damage to the headlight on the checklist. Plaintiff responded that he had completed the checklist without carefully inspecting the forklift. Howard advised plaintiff that he was suspended from his employment based on the result of the accident investigation. He offered plaintiff the opportunity to submit a report regarding the incident, but plaintiff never completed a report.

Later, Howard met with Clouse and Human Resources Manager Anthony Pearson to discuss plaintiff's accident history, the investigation about the May 20th incident, and the fact that, in their view, plaintiff had been untruthful in his statements about the broken headlight. Howard recommended that plaintiff be discharged from his employment, and Clouse and Pearson agreed with that recommendation. On May 23, 2005, Howard notified plaintiff by telephone that his employment had been terminated.

The evidence submitted further reveals that in August of 2004,

the Columbus Health Department offered free tuberculosis testing to defendant's employees using a skin test to determine whether the employees had been infected with the tuberculosis bacteria. A positive test result means that the individual has been infected with tuberculosis at some point in his life. Such an infection is known as latent tuberculosis, which is asymptomatic and noncontagious. An individual who tests positive for tuberculosis following the skin test is then tested by means of a chest x-ray for active tuberculosis, which can be both symptomatic and contagious. If the chest x-ray shows active tuberculosis, the individual's sputum is analyzed to determine whether any active tuberculosis bacteria are present. The presence of bacteria in the sputum indicates that the individual's tuberculosis is contagious.

Plaintiff's skin test for tuberculosis was positive, but his chest x-ray was negative for active tuberculosis. Plaintiff was prescribed a nine-month course of prophylactic medication, which plaintiff took from September of 2004 to May of 2005. Plaintiff never tested positive for active tuberculosis. Plaintiff complained that he had a tingling sensation in his hands and feet, fatigue, dizziness, night sweats, and loss of weight while taking the medication (plaintiff's physician indicated that only the tingling sensation was a potential side effect of the medication). However, plaintiff stated at his deposition that these symptoms were minor and did not prevent him from performing his duties as a forklift operator.

II. ADA Claim

The ADA prohibits employers from "discriminat[ing] against a qualified individual with a disability because of the disability of

such individual." 42 U.S.C. §12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. §12111(8). An individual is considered to have a "disability" if: (1) he has an impairment that substantially limits one or more of his major life activities; (2) there is a record of such an impairment; or (3) he is regarded by his employer as having such an impairment. 42 U.S.C. §12102(2).

The term "substantially limits" means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. §1630.2(j)(1). Working is a "major life activity." 29 C.F.R. §1630.2(i).

With respect to working, the term "substantially limits" means:

significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working

29 C.F.R. §1630.2(j)(3)(i).

In determining whether an individual is substantially limited in a major life activity, the court should consider the nature and severity of the impairment, the duration or expected duration of

the impairment, and the permanent or long term impact or the expected permanent or long term impact of or resulting from the impairment.  29 C.F.R. §1630.2(j)(2).

A claim of discrimination may be proven by means of direct evidence, or indirectly by using the framework for deciding discrimination cases set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  To establish a prima facie case under the ADA, plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the defendant knew or had reason to know of the disability; and (5) the position remained open while the defendant sought other applicants or the plaintiff was replaced.  <u>Doren v. Battle Creek Health System</u>, 187 F.3d 595, 597 (6th Cir. 1999).  Plaintiff bears the burden of establishing as an element of his prima facie case the existence of an impairment that substantially limits a major life activity.  <u>Doren</u>, 187 F.3d at 598.

If plaintiff establishes the elements for a prima facie case, the burden then shifts to the defendant to set forth a legitimate, nondiscriminatory reason for the adverse employment action.  <u>Brenneman v. MedCentral Health System</u>, 366 F.3d 412, 417 (6th Cir. 2004); <u>Kocsis v. Multi-Care Management, Inc.</u>, 97 F.3d 876, 883 (6th Cir. 1996).  If the defendant carries this burden of production, plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reasons were not the true reasons for the employment action, but rather were a pretext for illegal discrimination.  <u>Kocsis</u>, 97 F.3d at 883.  (a plaintiff must produce

enough evidence that a jury could reasonably reject the employer's explanation for its decisions).

To raise a genuine issue of material fact on the validity of an employer's explanation for the adverse job action, plaintiff must show by a preponderance of the evidence that the proffered reasons had no basis in fact, that the proffered reasons did not actually motivate the action, or that they were insufficient to motivate the action.  Id.  Plaintiff always retains the ultimate burden of persuasion.  Brenneman, 366 F.3d at 418.

No direct evidence of discrimination has been produced in this case.  In regard to the first element of the prima facie case under McDonnell Douglas, there is no evidence to establish that plaintiff actually had any physical or mental impairment that substantially limited any major life activity, including his ability to perform his job.  Although plaintiff complained that he experienced a tingling sensation, fatigue, dizziness, night sweats and loss of weight while taking the medication designed to address his latent tuberculosis, plaintiff concluded this course of medication in May of 2005, about the time of his termination.  Thus, these symptoms were only temporary.  See Lester v. Trans World Airlines, Inc., No. 95 C 2349 (unreported), 1997 WL 417814 (N.D.Ill. July 23, 1997)(noting that since employee only suffered from symptoms of active tuberculosis temporarily, employee was not disabled). Further, plaintiff admitted at his deposition that these symptoms were minor and did not prevent him from performing his job as a forklift operator.  There is no evidence that either the latent tuberculosis or the medication plaintiff took for that condition substantially interfered with plaintiff's ability to perform his

11

job.

Plaintiff's claim appears to be that defendant regarded him as disabled because he tested positive for latent tuberculosis. The third branch of the definition of "disability" may be met when the employer mistakenly believes that the employee has a physical impairment that substantially limits one or more major life activities, or mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999). "In both cases, it is necessary that a covered entity entertain misperceptions about the individual–it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." Id. When the major life activity at issue is working, plaintiff must allege that he is regarded as unable to work in a broad class of jobs. Cotter v. Ajilon Services, Inc., 287 F.3d 593, 599 (6th Cir. 2002). It is not enough for the employer to regard the employee as being incapable of satisfying the singular demands of a particular job. Id.

Defendant argues that it was unaware of any facts that would suggest that plaintiff's latent tuberculosis and any side effects he experienced as a result of the medication he was taking constituted a "disability" as that term is defined in the ADA. Howard, Pearson and Clouse stated in their declarations that at no time did they perceive plaintiff to be substantially limited in any major life activity. They also stated that in deciding whether to terminate plaintiff's employment, they did not discuss plaintiff's medical condition or any medication he was taking, and that these

12

matters were not a factor in their decision to terminate his employment.

Plaintiff has produced answers to interrogatories in which he listed employees who were present at a meeting at which Charlie Miller, the complex director, stated that if anyone tested positive for tuberculosis, it was not contracted at Kraft Foods. This simply indicates that the testing was discussed in general at a meeting, and that the complex director was reassuring employees that the facility did not present a risk as a source for contagious tuberculosis. It does not establish that defendant viewed employees who tested positive for latent (noninfectious) tuberculosis as being disabled.

Plaintiff also notes a series of e-mails between Clouse and Pearson on December 16 and 17, 2004. In an e-mail, Clouse reported to Pearson that plaintiff had expressed concerns that side effects from his medication, including headaches and numbness in his feet and hands, were affecting his performance, and that plaintiff had been told by the Columbus Health Department to consult with his physician. He also noted that plaintiff had received verbal and written warnings about his performance.

Pearson responded by e-mail, summarizing a conversation he had with "Kim," an individual at the Columbus Health Department. Kim informed him that the department told plaintiff that it would require a release from plaintiff's physician to treat plaintiff with the medication. Pearson further stated that Kim had not heard of others who were taking the medication experiencing the side effects reported by plaintiff. Pearson stated that plaintiff should talk to his doctor about the side effects, but that

13

plaintiff was responsible for his performance. Clouse then informed Menta, Howard and Pearson that they would have to discuss the matter with plaintiff. Clouse and Menta subsequently met with plaintiff in December of 2004 or January of 2005, and plaintiff complained that he was experiencing numbness and tingling and his hands, which was "affecting [him] at work a little bit" and that he was feeling tired and run down. Plaintiff's Dep., pp. 303-08.

Although this evidence indicates that plaintiff's supervisors were aware of plaintiff's latent tuberculosis and the fact that he was taking medication, it does not show that his supervisors mistakenly concluded that this condition or any side effects from the medication plaintiff may have experienced five months prior to his termination substantially limited his ability to do his job at the time of termination. Up to his termination, plaintiff performed the duties of his physically demanding position as a forklift operator. Plaintiff has produced no evidence that he was unable to perform that job due to any medical condition or medication. There is no evidence that plaintiff ever requested any kind of accommodation as a result of his latent tuberculosis or any side effects from the medication he was taking. Plaintiff did not notify anyone in defendant's management that he was disabled, as required by defendant's policy. An employer has notice of the employee's disability when the employee tells the employer that he is disabled, and the employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation. Hammon v. DHL Airways, Inc., 165 F.3d 441, 450 (6th Cir. 1999)(merely reporting loss of confidence not sufficient to notify employer that plaintiff suffered from an

14

anxiety disorder serious enough to interfere with his ability to perform job); Brown v. BKW Drywall Supply, Inc., 305 F.Supp.2d 814, 829 (S.D.Ohio 2004)(notice of fact that employee has health problems does not necessarily constitute notice of a disability).

Plaintiff has failed to produce evidence sufficient to raise a genuine issue of material fact in regard to whether he was disabled, or whether defendant knew he was disabled or mistakenly perceived him as being disabled or unable to perform a range of jobs. He has therefore failed to show that he could establish a prima facie case of discrimination.

Even if it is assumed that plaintiff can prove a prima facie case, defendant has produced evidence of legitimate, nondiscriminatory reasons for plaintiff's termination. In terminating plaintiff, his supervisors relied on the investigation of the accident on May 20, 2005, and their conclusion that plaintiff was not truthful in his statements regarding that accident, as well as plaintiff's previous history of accidents. Safety violations and dishonesty are grounds for discharge under defendant's Performance Standards and Guidelines.

Defendant invokes the "honest belief" rule. That rule provides that as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is disputed by the employee or even shown to be incorrect. Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1117 (6th Cir. 2001). An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied on the particularized facts that were before it at the time

the decision was made.  Id.; Braithwaite v. Timken Co., 258 F.3d 488, 493 (6th Cir. 2001).

Here, an investigation was conducted by plaintiff's supervisors regarding the broken headlight.  The investigation disclosed that plaintiff had used a regular forklift even though he had been instructed by his supervisor to load a Talon trailer, and that plaintiff did not state on the pre-operation checklist which he completed at the beginning of his shift that a headlight on the forklift was broken.  The investigation also revealed that the Talon trailer plaintiff was loading on May 20th had broken glass on the back edge of the tailgate, damage to its header where the forklift's overhead guard struck it, and damage to the side frame of its door opening at the same height as the broken headlight on the forklift.  Defendant could reasonably conclude from its investigation that plaintiff was responsible for the broken headlight, and that plaintiff had falsely stated that he was not responsible for the damage.  The mere fact that plaintiff denied responsibility for the broken headlight is insufficient to call into question defendant's honest belief that plaintiff was responsible for the broken headlight or that he lied about the accident.  It is also insufficient to raise a genuine issue of material fact as to whether the reasons for plaintiff's discharge were pretextual.  Majewski, 274 F.3d at 1117.

Plaintiff contends that he was a dependable employee and had no problems or write-ups until he tested positive for latent tuberculosis in August of 2004.  However, the evidence indicates that prior to the tuberculosis testing, plaintiff was verbally counseled on April 2, 2004, and issued a corrective interview on

16

May 1, 2004, concerning his productivity, and was involved in an accident on March 26, 2004, for which no discipline was imposed. The record also shows that plaintiff was involved in three accidents after the tuberculosis testing, specifically, on October 16, 2004, December 16, 2004, and January 19, 2005, for which no discipline was imposed. The fact that no discipline was imposed at the time of these accidents undermines any inference that plaintiff's termination in May of 2005 after three additional accidents on March 5, 2005, April 2, 2005, and May 20, 2005, was motivated by his latent tuberculosis.

Plaintiff alleges in general terms that other employees were treated more favorably in the matter of discipline. To establish a prima facie case of disparate treatment under the ADA, plaintiff must show that: (1) he is disabled; (2) he is otherwise qualified for the position; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of his disability; and (5) similarly situated non-disabled employees were treated more favorably. Hopkins v. Electronic Data Systems Corp., 196 F.3d 655, 660 (6th Cir. 1999). To be similarly situated, exact correlation is not required, but the plaintiff and the employee with whom the plaintiff seeks to compare himself must be similar in "all of the relevant aspects." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998)(quoting Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994)). The non-disabled employees must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them. See

17

Ercegovich, 154 F.3d at 352.

Plaintiff states in his motion for summary judgment that other employees had more accidents than he did, and that several employees did not tell the truth about those accidents. However, plaintiff does not identify these other employees, nor is there any evidence that the other employees who were treated more favorably were not disabled, or did not test positive for latent tuberculosis. No evidence has been presented concerning the disciplinary records of these other employees. Thus, there is no evidence that these other employees were non-disabled employees who were otherwise similarly situated to the plaintiff. Plaintiff's conclusory statements, unsupported by affidavits or other evidence, are insufficient to defeat defendant's motion for summary judgment. See Anderson, 477 U.S. at 250 (a motion for summary judgment is only defeated through the production of evidence showing that there is a genuine issue for trial); Cotter, 287 F.3d at 598 (conclusory statement not sufficient to avoid summary judgment); Fed.R.Civ.P. 56(e). In addition, as noted previously, defendant has presented a legitimate, nondiscriminatory reason for plaintiff's termination, and plaintiff has produced no evidence sufficient to show pretext.

Plaintiff has failed to show that a genuine issue of material fact exists in regard to his ADA claim, and defendant is entitled to summary judgment on that claim.

III. Retaliation Claim

Plaintiff claims that his discharge was in retaliation for filing a workers' compensation claim. Ohio Rev. Code §4123.90 provides:

18

> No employer shall discharge, demote, reassign, or take
> any punitive action against any employee because the
> employee filed a claim or instituted, pursued or
> testified in any proceedings under the workers'
> compensation act for an injury or occupational disease
> which occurred in the course of and arising out of his
> employment with that employer.

This provision is narrow in scope, and does not prevent an employer from discharging an employee for who is unable to perform his or her duties, or for any just and lawful reason. White v. Mount Carmel Medical Center, 150 Ohio App.3d 316, 328, 780 N.E.2d 1054 (2002). Rather, the statute protects only against termination in direct response to the filing or pursuit of a workers' compensation claim. Id.; Markham v. Earle M. Jorgensen Co., 138 Ohio App.3d 484, 493, 741 N.E.2d 618 (2000). To establish a claim of retaliatory discharge, plaintiff must show that: (1) he engaged in protected activity; (2) he was the subject of an adverse employment action; and (3) a causal link existed between the protected activity and the adverse action. White, 150 Ohio App.3d at 328. If plaintiff meets this prima facie case, the burden shifts to the defendant to give a legitimate nondiscriminatory reason for the action. Id. If the defendant meets this burden, then plaintiff must show that the articulated reason was a pretext for the adverse action. Id

The first two elements of plaintiff's prima facie case have been met. In attempting to show a causal connection between the filing of his workers' compensation claim on February 23, 2005, and his termination on May 23, 2005, plaintiff relies on the proximity in time of the two events. However, temporal proximity alone is insufficient to support a causal connection. Cunningham v. The Kroger Co., No. C-050990 (1st Dist. unreported), 2006 WL 3230323 at

19

*3 (Ohio App. Nov. 9, 2006)(citing <u>Pflanz v. Cincinnati</u>, 149 Ohio App.3d 743, 778 N.E.2d 1073 (2002)).

Even assuming that plaintiff has satisfied the elements of a prima facie case, defendant has produced evidence of a legitimate, non-retaliatory reason for plaintiff's termination. Defendant has submitted evidence showing that the reason for plaintiff's termination was his accident with the forklift on May 20, 2005, his supervisors' conclusion that he gave a false statement in regard to that accident, and his previous history of accidents. Howard, Pearson, and Clouse stated in their declarations that they did not discuss plaintiff's workers' compensation claim in deciding whether to terminate his employment, and that the fact that he had filed a claim was not a factor in his termination. In fact, it is not clear from the evidence whether Howard, Pearson, and Clouse, the persons involved in the decision to terminate plaintiff's employment, even knew at the time of plaintiff's termination that plaintiff had filed a workers' compensation claim. Plaintiff has failed to produce evidence to rebut defendant's proffered reason or to show that it was a mere pretext for retaliation.

Plaintiff notes that his employment was terminated three months after he filed his workers' compensation claim. However, mere temporal proximity is insufficient to rebut defendant's legitimate reason for discharge. <u>White v. Simpson Industries, Inc.</u>, 1 Fed.Appx. 462, 466, 2001 WL 45240 (6th Cir. 2001). <u>See also Wysong v. Jo-Ann Stores, Inc.</u>, No. 21412 (2nd Dist. unreported), 2006 WL 2578867 at *6 (Ohio App. Sept. 8, 2006)(two-month interval between filing of claim and termination insufficient to support an inference of retaliation or to create a genuine issue of material

fact on the issue of pretext).  In addition, plaintiff's employment was not terminated for accidents on March 5, 2005, and April 2, 2005, which occurred after he filed his workers' compensation claim.  The use of appropriately progressive discipline undermines any inference of retaliatory motive.

Plaintiff has failed to present evidence sufficient to raise a genuine issue of fact in regard to his retaliation claim, and defendant is entitled to summary judgment on that claim.

IV. Conclusion

In accordance with the foregoing, defendant's motion for summary judgment is granted.  Plaintiff's motion for summary judgment is denied.  The clerk shall enter judgment in favor of the defendant on plaintiff's claims.


Date: February 27, 2007          _____s\James L. Graham_____
                                 James L. Graham
                                 United States District Judge